Barry I. Levy, Esq.
Priscilla Kam, Esq.
Philip P. Nash, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and              Docket No.:_____ (      )
GEICO CASUALTY COMPANY,

                              Plaintiffs,

                                                          **Plaintiff Demands a Trial by Jury**

                  -against-

DIANA VAVIKOVA, D.C., STAR CHIROPRACTIC,
P.C., ACTIVE LIFE CHIROPRACTIC, P.C.,
PROFESSIONAL CHIROPRACTIC CARE, P.C.,
FUTURE CHIROPRACTIC CARE, P.C., and JOHN
DOE DEFENDANTS "1" – "10",

                              Defendants.

------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against defendants, Diana Vavikova, D.C., Star

Chiropractic Care, P.C., Active Life Chiropractic Care, P.C., Professional Chiropractic Care, P.C.,

Future Chiropractic Care, P.C., and John Doe Defendants "1" through "10" (collectively, the

"Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      GEICO brings this action to terminate an on-going fraudulent scheme perpetrated by the Defendants who exploited the New York "No-fault" insurance system by submitting millions of dollars in charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services in the form of so-called musculoskeletal diagnostic ultrasounds (the "Fraudulent Services"), allegedly provided to New York automobile accident victims who were insured by GEICO ("Insureds").   As discussed in this complaint, the Fraudulent Services were provided and billed without regard for genuine patient care, but rather, for the Defendants financial benefit and as a result of unlawful financial arrangements between the Defendants and others.

2.      Defendant Diana Vavikova, D.C. ("Vavikova") is a chiropractor licensed to practice in New York who purports to own a series of medical entities, including Defendants Star Chiropractic Care, P.C. ("Star Chiro"), Active Life Chiropractic Care, P.C. ("Active Life Chiro"), Professional Chiropractic Care, P.C. ("Professional Chiro"), and Future Chiropractic Care, P.C. ("Future Chiro" and collectively, the "Provider Defendants"), through which billing was submitted to GEICO for the Fraudulent Services. The Provider Defendants purport to be legitimate medical practices, but instead operated on a transient basis, maintaining no stand-alone practice, having no patients of their own, and providing no legitimate or medically necessary services to GEICO's Insureds.   Vavikova, along with John Doe Defendants "1"-"10", perpetrated the fraudulent scheme using illegal referral and kickback arrangements to permit the Provider Defendants to access a steady stream of patients, fraudulently bill GEICO, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

2

3.     By this action GEICO seeks to recover the monies stolen from it, amounting to more than $360,000.00, and further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $2.4 million in pending no-fault insurance claims that have been submitted by or on behalf of the Provider Defendants because:

(i)     the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)    the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services and through the use of illegal kickback arrangements; and

(iii)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.

4.     The Defendants fall into the following categories:

(i)     Defendant Vavikova is a chiropractor licensed to practice in New York, who purported to own the Provider Defendants, and who purported to read the diagnostic ultrasounds and issued reports based upon her interpretation of the images.

(ii)    The Provider Defendants are New York medical professional corporations and sole proprietorship through which the Fraudulent Services purportedly were performed and were billed to automobile insurance companies, including GEICO.

(iii)   John Doe Defendants "1"-"10" are individuals and/or entities currently unidentifiable to GEICO, who participated in the fraudulent scheme by, among other things, ensuring that Insureds were referred to the Provider Defendants for Fraudulent Services in exchange for kickbacks and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

5.     As discussed herein, Defendants at all relevant times have known that: (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially

enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to the dictates of unlicensed laypersons and through the use of illegal kickback arrangements; and (iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.

6.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through the Provider Defendants.

7.      The charts annexed hereto as Exhibits "1" through "4" set forth a representative sample of the fraudulent claims that have been identified to-date that Defendants submitted, or caused to be submitted, to GEICO.

8.      Defendants' fraudulent scheme at issue began in 2022 -- with the Defendants opening and closing the Provider Defendants in sequential fashion to avoid GEICO's investigations of the individual Provider Defendants -- and continues uninterrupted through the present day as Defendants continue to seek collection on pending charges for the Fraudulent Services from the multiple Provider Defendants.

9.      As a result of Defendants' fraudulent scheme, GEICO has incurred damages of more than $360,000.00.

## THE PARTIES

### I.   Plaintiffs

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska

4

corporations with their principal place of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

## II.     **Defendants**

11.     Defendant Vavikova resides in and is a citizen of New York.  Vavikova was licensed to practice chiropractic medicine in New York on February 5, 1999 and serves as the nominal or "paper" owner of the Provider Defendants.

12.     Vavikova is no stranger to these types of fraudulent schemes and was previously sued by GEICO as part of a fraudulent No-Fault insurance scheme.  In that matter, it was alleged that Vavikova "sold" her chiropractic license to non-medical laypersons who used her license to illegally profit from fraudulent healthcare services.  See, Gov't Emps. Ins. Co. et al v. Trinity Medicine, P.C. et al., Case No. 1:20-cv-03080-NGG-MMH (E.D.N.Y. 2020).

13.     Vavikova and Professional Chiro were also sued by State Farm as part of a No-Fault insurance scheme in which it was alleged that Vavikova used Professional Chiro and other professional corporations to submit fraudulent medical and chiropractic bills to State Farm designed to extract payments from State Farm they were never entitled to.  See, State Farm Mut. Auto. Ins. Co., et al. v. Modern Chiropractic, P.C., et al., 2-19-cv-05895-RRM-SJB.

14.     Vavikova and Star Chiro were also sued by Liberty Mutual as part of a No-Fault insurance scheme similar to the one alleged in this Complaint.  See, Liberty Mut. Ins. Co., et al. v. Diana Vavikova, D.C., et al., 1:23-cv-05867-LDH-VMS (E.D.N.Y. 2023).

15.     Defendant Professional Chiro is a New York professional corporation incorporated on or about July 19, 2011 and purports to be owned and controlled by Vavikova.

16.     Defendant Future Chiro is a New York professional corporation incorporated on or about October 3, 2016 and purports to be owned and controlled by Vavikova.

17. Defendant Active Life Chiro is a New York professional corporation incorporated on or about December 21, 2020 and purports to be owned and controlled by Vavikova.

18. Defendant Star Chiro is a New York professional corporation incorporated on or about December 30, 2020 and purports to be owned and controlled by Vavikova.

19. John Doe Defendants "1" – "10" reside in and are citizens of New York. John Doe Defendants "1" – "10" are unlicensed, non-professional individuals and entities, presently not identifiable, who knowingly participated in the fraudulent scheme by, among other things, referring Insureds to the Provider Defendants in exchange for kickbacks and spearheading the pre-determined fraudulent protocols used to maximize profits, without regard to genuine patient care.

## JURISDICTION AND VENUE

20. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

21. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

22. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

23. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the district where one or more of the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.      Pertinent New York Law Governing No-Fault Insurance Reimbursement**

24.      GEICO underwrites automobile insurance in New York.

25.      New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide Personal Injury Protection Benefits ("PIP Benefits") to Insureds.

26.      In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including medical services.

27.      In New York, an Insured can assign his/her right to PIP Benefits to health care goods and services providers in exchange for those services.

28.      In New York, pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, in New York, a healthcare services provider may submit claims using the Health Care Financing Administration claim form (known as the "HCFA-1500 form").

29.      Pursuant to the New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

30.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

31.     Medical professional entities incorporated in New York must both be owned by a licensed professional authorized by law to practice in New York and who is actually engaged in the practice of medicine in such corporation. N.Y. Bus. Corp. Law §1507.

32.     In New York, only a licensed healthcare professional may practice their pertinent healthcare profession, may own and control a professional corporation authorized to operate a professional healthcare practice, and, absent statutory exceptions not applicable in this case, may derive economic benefit from professional healthcare services.  Unlicensed individuals in New York may not practice the pertinent healthcare profession, may not own or control a professional corporation authorized to operate a professional healthcare practice, may not employ or supervise healthcare professionals, and, absent statutory exceptions not applicable in this case, may not derive economic benefit from professional healthcare services.

33.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a; 6530(18); and 6531.

34.     New York law prohibits unlicensed persons not authorized to practice a profession, like chiropractic, from practicing the profession and from sharing in the fees for professional services.  <u>See</u> <u>e.g.</u>, New York Education Law §6512, §6530 (11), and (19).

35.     Therefore, under the New York no-fault insurance laws, a healthcare services provider is not eligible to receive PIP Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments rendered, or allows unlicensed laypersons to share in the fees for the professional services.

36.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.  In Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389, 393 (2019), the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

37.     Pursuant to the New York no-fault insurance laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect PIP Benefits.  There is both a statutory and regulatory prohibition against payment of PIP Benefits to anyone other than the patient or his/her healthcare services provider.  The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

38.     Accordingly, for a healthcare services provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it must be the actual provider of the services.  Under the New York no-fault insurance laws, a

healthcare services provider is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

39.    In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

40.    When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

41.    Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    The Defendants' Fraudulent Scheme

### A.    Overview of the Scheme

42.    Beginning in 2022, and continuing through the present, Vavikova, the Provider Defendants, and John Doe Defendants "1" – "10", implemented a complex fraudulent scheme in which the Provider Defendants were used to bill GEICO and other New York automobile insurers

millions of dollars for medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services.

43.     Vavikova submitted billing for the Fraudulent Services under the Provider Defendants in near sequential fashion: (i) Star Chiro billed GEICO from June 7, 2022 through January 18, 2023; (ii) Future Chiro billed GEICO from December 1, 2022 through February 28, 2023; (iii) Professional Chiro billed GEICO from December 1, 2022 through March 21, 2023; and (iv) Active Life Chiro billed GEICO from December 15, 2022 through August 30, 2023.

44.     The Defendants switched which of the Provider Defendants billed GEICO, including resurrecting Professional Chiro, an entity which had not billed GEICO for services since 2016, in order to evade GEICO's investigations of the individual providers and continue the fraudulent scheme.

45.     The Fraudulent Services billed using the names of the Provider Defendants were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render healthcare services.

46.     Vavikova did not operate the Provider Defendants at any single, fixed location.

47.     Vavikova did not market the existence of any of the Provider Defendants to the general public.

48.     Vavikova did not advertise for patients, never sought to build name recognition or make any legitimate efforts of her own to attract patients on behalf of any of the Provider Defendants.

49.     Vavikova did not have her own patients and did nothing to create a patient base.

50. Vavikova did virtually nothing that would be expected of the owner of legitimate medical professional corporations to develop their reputation and attract patients.

51. Vavokova and the Provider Defendants also provided, or purported to provide, as their only service diagnostic ultrasounds to automobile accident victims, despite the fact that there is no medical support or evidence for using ultrasounds on patients in that context.

52. Vavikova, nevertheless, operated the Provider Defendants on an itinerant basis from at least thirty-nine (39) "No-Fault" medical clinics, primarily located in Brooklyn, Queens, and the Bronx, where the Provider Defendants received steady volumes of patients through no efforts of their own, including at the following clinics (collectively, the "Clinics"):

- 3209 Fulton St., Brooklyn;
- 488 Lafayette Ave., Brooklyn;
- 486 McDonald Ave., Brooklyn;
- 2273 65th St., Brooklyn;
- 1251 Ralph Ave., Brooklyn;
- 5205 Church Ave., Brooklyn;
- 2184 Flatbush Ave., Brooklyn;
- 1100 Pelham Pkwy., Bronx;
- 2534 Westchester Ave., Bronx;
- 3055 3rd Ave., Bronx;
- 34-07 White Plains Rd., Bronx;
- 4014A Boston Rd., Bronx;
- 42-50 White Plains Rd., Bronx;
- 560 Prospect Ave., Bronx;
- 719 Southern Blvd., Bronx;
- 160-59 Rockaway Blvd., Bronx;
- 172-17 Jamaica Ave., Jamaica;
- 1975 Linden Blvd., Elmont;
- 37 Smith St., Freeport;
- 37-23 72nd St., Jackson Heights;
- 62-69 99th St., Rego Park;
- 79-45 Metropolitan Ave., Flushing;
- 92-05 Rockaway Blvd., Ozone Park; and
- 92-08 Liberty Ave., Jamaica.

53.     As part of the scheme, Vavikova submitted billing to GEICO via the Provider Defendants in sequential fashion from the Clinics in an effort to mask the scheme and artificially lower the total amounts billed to GEICO by any one of the Provider Defendants.

54.     For example, GEICO received billing purported "diagnostic ultrasounds" purportedly rendered to various Insureds from:

 (i) the Clinic located at 1100 Pelham Pkwy., Bronx, New York under the name of: (i) Star Chiro, for dates of service ranging from June 15, 2022 to November 22, 2022; (ii) Future Chiro, for dates of service ranging from December 5, 2022 to February 27, 2023; and (iii) Active Life Chiro, for dates of service ranging from March 8, 2023 through at least August 14, 2023;

 (ii) the Clinic located at 2354 Westchester Ave., Bronx, New York under the name of: (i) Star Chiro, for dates of service ranging from June 16, 2022 to November 28, 2022; (ii) Future Chiro, for dates of service ranging from December 12, 2022 to February 7, 2023; and (iii) Active Life Chiro, for dates of service ranging from March 7, 2023 through at least August 8, 2023;

 (iii) the Clinic located at 92-05 Rockaway Blvd., Ozone Park, New York under the name of: (i) Star Chiro, for dates of service ranging from June 14, 2022 to December 21, 2022; (ii) Professional Chiro, for dates of service ranging from December 7, 2022 to February 28, 2023; and (iii) Active Life Chiro, for dates of service ranging from March 15, 2023 through at least August 23, 2023;

 (iv) the Clinic located at 719 Southern Blvd., Bronx, New York under the name of: (i) Star Chiro, for dates of service ranging from June 22, 2022 to November 29, 2022; (ii) Future Chiro, for dates of service ranging from December 6, 2022 to February 28, 2023; and (iii) Active Life Chiro, for dates of service ranging from March 15, 2023 through at least August 22, 2023; and

 (v) the Clinic located at 3055 3rd Ave., Bronx, New York under the name of: (i) Star Chiro, for dates of service ranging from September 2, 2022 to November 30, 2022; (ii) Future Chiro, for dates of service ranging from December 7, 2022 to February 21, 2023; and (iii) Active Life Chiro, for dates of service ranging from February 28, 2023 through at least August 24, 2023.

**B. The Illegal Kickback and Referral Relationships**

55.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality were organized to supply "one-stop" shops for no-fault insurance fraud.

56.     The Clinics provided facilities for the Provider Defendants, as well as a "revolving door" of medical professional corporations, chiropractic professional corporations, acupuncture professional corporations, physical therapy professional corporations and/or a multitude of other purported healthcare providers, all geared towards exploiting New York no-fault insurance system.

57.     In fact, GEICO received billing from many of the Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

58.     For example, since January 1, 2020, GEICO has received billing for purported healthcare services rendered at the clinic located at 1975 Linden Blvd, Elmont., New York, from a "revolving door" of over 115 purportedly different healthcare providers.

59.     In addition, and also since January 1, 2020, GEICO has received billing for purported healthcare services rendered at the clinic located at 79-45 Metropolitan Ave., Flushing, New York from over 80 purportedly different healthcare providers, from the clinic located at 560 Prospect Ave., Bronx, New York, from at least 66 purportedly different healthcare providers, and from the clinic located at 2184 Flatbush Ave., Brooklyn, New York, from a "revolving door" of at least 56 purportedly different healthcare providers.

60.    Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics.

61.    Vavikova, in order to obtain access to the Clinics' patient base (i.e., Insureds), entered into illegal financial arrangements with unlicensed persons, including John Doe Defendants "1" – "10", who "brokered" or "controlled" patients that were treated, or who purported to be treated, at the Clinics and who controlled the provision of the healthcare services to these patients.

62.    For example, micha Nurse Practitioner who worked at the Clinic located at 1975 Linden Boulevard, Elmont stated under oath that she resigned from the Clinic after discovering that her name, license, and tax identification number were being used to bill for services that she never performed, authorized, or supervised.  Similarly, several of the Clinics identified above where the Defendants purported to operate from and pay rent are at issue in U.S. v. Rose, 19-cr-00789 (S.D.N.Y. 2019), a criminal proceeding where it has been asserted that confidential patient information was used to solicit and steer patients to a network of medical clinics under layperson control and where clinic controllers paid kickbacks in exchange for these patient referrals.

63.    The financial arrangements that the Defendants entered into included the payment of fees, ostensibly designed as "rent" payments to sublet the use of a single exam room at each of the Clinics for two or three times each month for between $500.00 to $1,000.00 per month.

64.    In exchange for these purported "rent" payments, the Provider Defendants received referrals for Fraudulent Services that were allegedly issued by the healthcare providers treating Insureds at each Clinic.

65.    In addition, the Defendants paid thousands of dollars in kickbacks for patient referrals at the Clinics via payments made to a revolving door of fictitious businesses, disguised as ostensibly legitimate services such as consulting, office supplies, computer services, and

transportation services.  These phony payments for purported services were actually "pay-to-play" arrangements that caused unlicensed laypersons to steer Insureds to the Provider Defendants for medically unnecessary services at the Clinics.

66.    Vavikova at all times knew that the kickback and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

67.    In addition to issuing payments to a range of fictitious businesses, the Defendants also issued checks to legitimate businesses, but these checks were merely an effort to mask the kickback scheme and were never actually provided to the legitimate business by the Defendants, who instead routed these checks to the John Doe Defendants where they were cashed at a check-cashing facility in New Jersey.

68.    To further mask the scheme, and in support of the fact that these payments were issued solely in support of the unlawful financial arrangements between the Defendants and others not presently identifiable to GEICO in order to obtain referrals for the Fraudulent Services, fictitious invoices for "services" purportedly provided by these various business were created by persons currently unknown to GEICO and provided to the Defendants, when in fact no such services were ever provided to the Defendants.

69.    For example, Star Chiro purportedly received bogus invoices purporting to be issued by the following legitimate businesses, when in fact no such invoices were actually generated by these companies and were instead created by persons currently unknown to GEICO to mask the kickback scheme: (i) All Boro Medical Waste, Inc., located in Astoria, New York, for "File Transcription" and "On Location Document Shredding", when All Boro Medical Waste is a medical waste disposal company; and (ii) Always On Time, located in Las Vegas, Nevada for "Client Transportation Services", when Always On Time is an online transcription service.

70.     In response to these bogus invoices and others, Vavikova and Star Chiro issued checks that were never intended to be provided to the legitimate companies on the invoices, but were instead illegally cashed at a check-cashing facility in New Jersey – Banc Alt LLC d/b/a Check Pros ("Check Pros") – as part of the Defendants' unlawful financial arrangements with others not presently identifiable to GEICO in order to obtain referrals for Fraudulent Services.

71.     Additionally, and in further support of the fact the Defendants participated in an elaborate scheme to hide their kickback payments by way of bogus invoices, Star Chiro received an invoice purportedly issued by a legitimate marketing company, A4D, Inc., located in Carlsbad, California, when A4D, Inc. issued no such invoice.

72.     In response to the bogus invoice purportedly issued by A4D, Inc., Vavikova and Star Chiro instead issued a check to, AYD Consulting, LLC, a New York-based corporation that does not conduct any legitimate business activity, with an incorporation address of 79-45 Metropolitan Ave., Flushing, the same address as one of the Clinics where Star Chiro allegedly paid "rent" and in exchange received referrals from healthcare providers for Fraudulent Services.

73.     The above-mentioned examples are only a fraction of the monies paid by the Defendants in support of the unlawful financial arrangements between the Defendants and others who are not presently identifiable in order to obtain referrals for Fraudulent Services.

74.     The Defendants made the various kickback payments in exchange for having Insureds referred to one or more of the Provider Defendants for the medically unnecessary Fraudulent Services at the Clinics, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

75.     The amount of the kickbacks paid by the Defendants generally was based on the volume of Insureds steered to the Provider Defendants for the purported medically unnecessary services.

76.     Vavikova had no genuine doctor-patient relationship with the Insureds that visited the Clinics, as the patients had no scheduled appointments with the Provider Defendants.  Instead, the Insureds were simply directed by the Clinics, and the unlicensed persons associated therewith, to subject themselves to treatment by whatever technician was working for the Provider Defendants that day, because of the kickbacks paid by Defendants.

77.     The unlawful kickback and payment arrangements were essential to the success of the Defendants' fraudulent scheme. The Defendants derived significant financial benefit from the relationships because without access to the Insureds, the Defendants would not have the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

### C.     Defendants' Fraudulent Treatment and Billing Protocol

78.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentation.

79.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

80.     No legitimate chiropractor or other licensed healthcare provider or professional corporation would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

81.     The Defendants permitted the fraudulent treatment and billing protocol described below to proceed because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

**1.     The Medically Unnecessary Musculoskeletal Diagnostic Ultrasounds**

82.     As part of the fraudulent treatment protocol, Insureds were purportedly issued referrals for diagnostic ultrasounds by healthcare providers working at the Clinics.

83.     These referrals were then provided to the Defendants who then purported to provide the Insureds with medically unnecessary musculoskeletal diagnostic ultrasounds at the respective Clinic.

84.     As show in Exhibits "1" through "4", these diagnostic ultrasounds were billed by the respective Provider Defendants using CPT Code 76999, with a typical charge to GEICO ranging between $124.13 to $186.20 for each ultrasound purportedly rendered to Insureds.

85.     These charges for diagnostic ultrasounds were fraudulent in that the tests were medically unnecessary and were performed – to the extent they were performed at all – pursuant to predetermined fraudulent treatment protocols and illegal kickback and referral arrangements between the Defendants rather than the individual presentations and legitimate treatment needs of on the Insureds.

86.     In virtually every case where the Defendants provided an Insured with a diagnostic ultrasound, the ultrasound referral came from a healthcare provider who was operating at the same Clinic as the Defendants.

87.     These referrals contained virtually no information about the Insured's condition or prior treatment and consisted of the Insured's basic information, a list of differential diagnoses,

and a boilerplate "medical necessity" statement that was purportedly signed by the referring healthcare provider.

88.    In keeping with the fact that the diagnostic ultrasounds were not medically necessary and were provided pursuant to predetermined fraudulent protocols, to the extent that there was a contemporaneously dated evaluation or treatment report issued by the referring healthcare provider on the date of their referral of the Insured for a diagnostic ultrasound, the report virtually always failed to identify that the Insured was being referred for a diagnostic ultrasound and why the healthcare provider was referring the Insured for a diagnostic ultrasound.

89.    In a legitimate setting, when a patient returns for a follow-up examination after being referred for imaging, such as an MRI or ultrasound, the healthcare provider would review with the patient – and appropriately report – the findings of the imaging report. Such information is typically included so the healthcare provider can recommend a further course of treatment based on the imaging findings.

90.    However, follow-up examination or treatment reports issued by the referring healthcare providers, to the extent there were follow-up examinations, failed to include any information regarding the Insureds' diagnostic ultrasound reports generated by the Defendants.

91.    In addition to the fact that the referring healthcare providers' reports failed to mention any information regarding the diagnostic ultrasounds, and in further keeping with the fact that the referrals for diagnostic ultrasounds provided to the Defendants were part of predetermined fraudulent protocol – and not based upon medical necessity – the Defendants were regularly provided with referrals that contained a referring healthcare provider's signature that was photocopied or used a signature stamp and was never actually signed by the referring healthcare provider.

92.   For example:

Example 1: 488 Lafayette Ave., Brooklyn, New York

| Referral to Star Chiro dated: October 27, 2022 | Doctor's Name (printed): Martin Miller DC<br>Doctor's Signature: |
| --- | --- |
| Referral to Star Chiro dated: November 21, 2022 | Doctor's Name (printed): Martin Miller DC<br>Doctor's Signature: |

Example 2: 1251 Ralph Ave., Brooklyn, New York

| Referral to Star Chiro dated: November 9, 2022 | Doctor's Name (printed): Mishkina Terrane ADUN<br>LIC 310024<br>NPI 1508W/NPag<br>Doctor's Signature: |
| --- | --- |
| Referral to Star Chiro dated: November 21, 2022 | Doctor's Name (printed): Mishkina Terrane ADUN<br>LIC 310024<br>NPI 1508W/NPag<br>Doctor's Signature: |

Example 3: 148-21 Jamaica Ave., Jamaica, New York

| Referral to Star Chiro dated: November 15, 2022 | Doctor's Name (printed): Arianne Waith, DC<br>Doctor's Signature: |
| --- | --- |
| Referral to Star Chiro dated: November 29, 2022 | Doctor's Name (printed): Arianne Waith, DC<br>Doctor's Signature: |

Example 4: 160-59 Rockaway Blvd. Jamaica, New York

| Referral to Professional Chiro dated: January 16, 2023 | Doctor's Name (printed): *Abdalla Adamien* <br><br> Doctor's Signature: |
| Referral to Professional Chiro dated: February 16, 2023 | Doctor's Name (printed): *Abdalla Adamien* <br><br> Doctor's Signature: |
| Referral to Professional Chiro dated: February 23, 2023 | Doctor's Name (printed): *Abdalla Adamien* <br><br> Doctor's Signature: |

Example 5: 486 McDonald Ave., Brooklyn, New York

| Referral to Active Life Chiro dated: February 6, 2023 | Doctor's Name (printed): WEI HONG XU <br><br> Doctor's Signature: |
| Referral to Active Life Chiro dated: February 6, 2023 | Doctor's Name (printed): WEI HONG XU <br><br> Doctor's Signature: |

Example 6: 3432 E. Tremont Ave., Bronx, New York

| Referral to Active Life Chiro dated: June 19, 2023 | Doctor's Name (printed): DAVID CARMILI <br><br> Doctor's Signature: |
| Referral to Active Life Chiro dated: June 19, 2023 | Doctor's Name (printed): DAVID CARMILI <br><br> Doctor's Signature: |

Example 7: 79-45 Metropolitan Ave., Flushing, New York

| Referral to Active Life Chiro dated: June 21 2023 | Doctor's Name (printed): *Dr. Jordan Farsel, MD* |
| | Doctor's Signature: *[signature]* |
| Referral to Active Life Chiro dated: June 21, 2023 | Doctor's Name (printed): *Jorden Farsel, MD* |
| | Doctor's Signature: *[signature]* |

93.     These are only representative examples, as the Defendants received referral forms containing a photocopied or stamped signature purporting to be signed by at least 16 different healthcare providers originating from at least 18 separate Clinics.

94.     In addition, several referring healthcare providers who purportedly issued referrals to the Defendants and whose referrals also contained photocopied or stamped signatures were the subject of their own lawsuits alleging their participation in no-fault insurance schemes involving the performance of medically unnecessary services and illegal referral and kickback relationships, including Sheila Soman, M.D., Phelan Clancy, N.P, and Jean-Pierre Barakat, M.D.  See, Gov't Emp. Ins. Co. v. Sheila Soman, M.D., et al., 1:23-cv-01526-FB-MMH (E.D.N.Y. 2023); Gov't Emp. Ins. Co. v. Phelan Clancy, N.P., et al., 1:22-cv-07635-NGG-PK (E.D.N.Y 2022); Gov't Emp. Ins. Co. v. Jean-Pierre Barakat, M.D., et al., 1:22-cv-07532-NGG-RML (E.D.N.Y. 2022).

95.     The Defendants knew that these referrals from the referring healthcare providers were based upon photocopied or stamped signatures and never actually authorized by the referring healthcare provider, yet used these referrals as the basis to support the fraudulent charges identified in Exhibits "1" through "4" anyway, solely for their own financial enrichment.

96.     The charges for diagnostic ultrasounds identified in Exhibits "1" through "4" also falsely represented that such services were legitimately performed, when at all times these diagnostic ultrasounds were medically unnecessary and performed solely to maximize the Defendants' ability to bill GEICO and other insurers.

a.     Legitimate Applications of Musculoskeletal Diagnostic Ultrasounds

97.     Ultrasound testing is an imaging technique that relies on detection of the reflections or echoes generated as high-frequency sound waves that are passed into the body. Physicians commonly use this technique for a number of appropriate medical imaging purposes, including prenatal fetal imaging, abdominal and pelvic masses, and cardiac echocardiogram.

98.     There is no medical support for the use of diagnostic ultrasounds in the manner used by the Defendants; *i.e.,* to allegedly evaluate an automobile accident victim's response to treatment who is suffering radicular symptoms.

99.     In fact, the American Institute of Ultrasound Medicine, which consists of thousands of healthcare professionals and is dedicated to advancing the safe and effective use of ultrasound medicine, issued an official statement, stating in relevant part, "there is insufficient evidence in the peer-reviewed medical literature establishing the value of nonoperative spinal/paraspinal ultrasound in adults for diagnostic evaluations of conditions involving the intervertebral disks, facet joints and capsules, and central nerves. Therefore…the use of ultrasound in diagnostic evaluations, screening, or monitoring of therapy for these conditions has no proven clinical utility and should be considered investigational."

100.     Similarly, the American College of Radiology's 2021 treatment guidelines and appropriateness criteria for low back pain does not even include ultrasound as a diagnostic treatment option.

101.    Further, major medical carriers such as Cigna and Aetna consider diagnostic ultrasounds of the type performed by the Defendants to be experimental and investigational as the effectiveness has not been established and is therefore considered medically unnecessary and not covered.

102.    Despite this lack of medical value or utility to automobile accident victims suffering radicular symptoms, the Defendants routinely submitted fraudulent billing to GEICO for diagnostic ultrasounds purportedly rendered to Insureds.

103.    In keeping with the fact that the Defendants provided the diagnostic ultrasounds – to the extend they were provided at all – pursuant to a predetermined, fraudulent protocol, the Defendants purportedly provided multiple diagnostic ultrasounds to every Insured they treated. These diagnostic ultrasounds were of no clinical value in the manner used by the Defendants to purportedly evaluate the Insureds' responses to treatment when presenting with radicular symptoms resulting from automobile accidents.

104.    These medically useless diagnostic ultrasounds were part of the Defendants' predetermined fraudulent treatment and billing protocols and were designed solely to financially enrich the Defendants rather than to benefit any of the Insureds.

105.    In keeping with the fact that the diagnostic ultrasounds were part of a predetermined fraudulent treatment and billing protocol pursuant to illegal kickback and referral arrangements between the Defendants, Clinics, and John Doe Defendants, the Defendants performed diagnostic ultrasounds on Insureds within days of the underlying accident and without giving the Insureds an opportunity to respond to established conservative therapy.

106.    For example:

(vi)    On June 20, 2022, three Insureds named AP, TP, and DB were purportedly involved in an automobile accident and thereafter all began treating at the

Clinic located at 3407 White Plains Rd., Bronx, New York.  On June 24, 2022, AP, TP, and DB all purportedly received diagnostic ultrasounds through Star Chiro, *only four days* after AP, TP, and DB's accident;

(vii)   On August 30, 2022, an Insured named JT was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 3055 3rd Ave., Bronx, New York.  On September 2, 2022, JT purportedly received diagnostic ultrasounds through Star Chiro, *only three days* after JT's accident;

(viii)   On September 24, 2022, an Insured named GJ was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 719 Southern Blvd., Bronx, New York.  On September 28, 2022, GJ purportedly received diagnostic ultrasounds through Star Chiro, *only four days* after GJ's accident;

(ix)   On October 31, 2022, an Insured named SD was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 4014A Boston Rd., Bronx, New York.  On November 3, 2022, SD purportedly received diagnostic ultrasounds through Star Chiro, *only three days* after SD's accident;

(x)   On November 7, 2022, an Insured named VF was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 1251 Ralph Ave., Brooklyn, New York.  On November 9, 2022, VF purportedly received diagnostic ultrasounds through Star Chiro, *only two days* after VF's accident;

(xi)   On November 20, 2022, an Insured named TNH was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 1975 Linden Blvd., Elmont, New York.  On December 1, 2022, TNH purportedly received diagnostic ultrasounds through Professional Chiro, *only 11 days* after TNH's accident;

(xii)   On December 13, 2022, two Insureds named LG and DF were both purportedly involved in an automobile accident and thereafter both began treating at the Clinic located at 79-45 Metropolitan Ave., Flushing, New York.  On December 31, 2022, LG and DF both purportedly received diagnostic ultrasounds through Professional Chiro, *only eight days* after LG and DF's accident;

(xiii)   On December 24, 2022, two Insureds named SM and LE were both purportedly involved in an automobile accident and thereafter both began treating at the Clinic located at 160-59 Rockaway Blvd., Jamaica, New York.  On January 5, 2023, SM and LE both purportedly received diagnostic

ultrasounds through Professional Chiro, *only 12 days* after SM and LE's accident;

(xiv)    On January 26, 2023, an Insured named CP was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 160-59 Rockaway Blvd., Jamaica, New York.  On January 26, 2023, CP purportedly received diagnostic ultrasounds through Professional Chiro, *only 13 days* after CP's accident;

(xv)    On February 7, 2023, an Insured named MB was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 79-45 Metropolitan Ave., Flushing, New York.  On February 15, 2023, MB purportedly received diagnostic ultrasounds through Professional Chiro, *only eight days* after MB's accident;

(xvi)    On February 18, 2023, an Insured named GA was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 60 Belmont Ave., Brooklyn, New York.  On February 24, 2023, GA purportedly received diagnostic ultrasounds through Active Life Chiro, *only six days* after GA's accident;

(xvii)    On March 22, 2023, two Insureds named BH and LM were purportedly involved in an automobile accident and thereafter both began treating at the Clinic located at 1251 Ralph Ave., Brooklyn, New York.  On March 29, 2023, BH and LM both purportedly received diagnostic ultrasounds through Active Life Chiro, *only seven days* after BH and LM's accident;

(xviii)    On May 3, 2023, an Insured named RF was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 1320 Louis Nine Blvd., Bronx, New York.  On May 12, 2023, RF purportedly received diagnostic ultrasounds through Active Life Chiro, *only nine days* after RF's accident;

(xix)    On June 29, 2023, an Insured named CC was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 65-06 Roosevelt Ave., Woodside, New York.  On July 5, 2023, CC purportedly received diagnostic ultrasounds through Active Life Chiro, *only six days* after CC's accident;

(xx)    On August 8, 2023, an Insured named PL was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 3432 E. Tremont Ave., Bronx, New York.  On August 15, 2023, PL purportedly received diagnostic ultrasounds through Active Life Chiro, *only seven days* after PL's accident;

107.     In short, in all of the claims identified in Exhibits "1" through "4", the Defendants falsely represented that the musculoskeletal diagnostic ultrasounds were medically necessary, when in fact they were not medically necessary for each Insured and were instead provided pursuant to pre-determined fraudulent protocols and illegal kickback and referral arrangements between the Defendants and were therefore not eligible to collect No-Fault Benefits in the first instance.

       b.   The Medically Useless Healthcare Provider Referrals and "Serial" Ultrasounds

108.     As set forth in Exhibits "1" through "4", the diagnostic ultrasounds were billed through the respective Provider Defendants to GEICO under CPT code 76999 usually resulting in a charge of $124.13 or $186.20, per body part.

109.     The charges for the diagnostic ultrasounds were fraudulent in that the diagnostic ultrasounds were medically unnecessary, and were conducted, to the extent that they were conducted at all, pursuant to the improper financial agreements between the Defendants and the Clinics, and not pursuant to the documented and clinically reasonable needs of the Insureds.

110.     In a legitimate clinical setting, and to the extent there was any legitimate need for a diagnostic ultrasound, the decision to perform a diagnostic ultrasound would be based upon a written or electronic request originating from a physician or other appropriately licensed healthcare provider or under the physician or healthcare provider's direction, which would include a detailed history of the patient's treatment.

111.     In virtually every case where the Defendants provided an Insured with a diagnostic ultrasound, the ultrasound referral came from a physician who was operating at the same Clinic as the Defendants.

112.    These referrals contained virtually no information about the Insured's condition or prior treatment and consisted of the Insured's basic information, a list of differential diagnoses, a boilerplate "medical necessity" statement, and as further detailed above, many contained photocopied or stamped signatures.

113.    In keeping with the fact that the diagnostic ultrasounds purportedly performed by the Provider Defendants were medically unnecessary and performed to maximize the billing the Defendants could submit to GEICO, every Insured that received a diagnostic ultrasound from the Defendants was subjected to "serial" ultrasounds.

114.    In fact, virtually every Insured purportedly treated by the Defendants received between two and more than ten ultrasounds on one date of service.

115.    Not only is there no medical support for the use of diagnostic ultrasounds in the manner used by the Defendants, there also is a complete absence of medical support for the concept of performing multiple diagnostic ultrasounds to evaluate a patient's response to treatment.  Yet, in an attempt to extract the maximum billing out of each Insured who supposedly received diagnostic ultrasounds, the Defendants routinely purported to perform numerous diagnostic ultrasounds on virtually every Insured.

116.    In addition, the Defendants added modifier code "50" to their billing, indicating a bilateral procedure, which increased the amount of the charge by 50 percent in an effort to artificially increase the total amount of the fraudulent bills submitted to GEICO.

117.    The Defendants added billing modifier code "50", indicating a bilateral procedure, for the performance of diagnostic ultrasounds on body parts in which there is no bilateral component, including the cervical, thoracic, and lumbar spine.

118.   The addition of billing modifiers by the Defendants further inflated the already baseless charges for diagnostic ultrasounds submitted to GEICO.

119.   In many cases, the Insureds were purportedly subjected to more than one session of serial ultrasounds despite the fact that only a minimal amount of time had passed between the first and subsequent sets of ultrasounds that would have allowed the Insureds to benefit from further treatment or a change in treatment based on their ultrasound reports, to the extent the ultrasounds eve had any benefit in the manner used by the Defendants.

120.   Furthermore, the Defendants routinely performed the diagnostic ultrasounds on multiple sessions without any documentation or evidence of a change in treatment based on the findings of the ultrasounds. In fact, there was no indication from the Defendants that the Insureds' treatment changed.

121.   Despite the fact that there was no documented change in an Insured's treatment based on the diagnostic ultrasounds performed by the Defendants, the Defendants continued to administer these medically unnecessary diagnostic ultrasounds as part of the fraudulent treatment protocols established between the Defendants, Clinics, and John Doe Defendants, with multiple Insureds receiving Fraudulent Services through multiple of the Provider Defendants.

122.   For example:

(i)      On March 13, 2022, an Insured named AM was purportedly involved in an automobile accident and thereafter begin treating at the Clinic located at 3055 3rd Ave., Bronx, New York.  The Defendants then purported to provide the following Fraudulent Services to AM based upon fraudulent treatment protocols and without medical necessity: (i) on October 26, 2022, Star Chio purportedly performed six diagnostic ultrasounds; (ii) on December 7, 2022, Future Chiro purportedly performed six diagnostic ultrasounds; and (iii) on January 26, 2023, Future Chiro purportedly performed five diagnostic ultrasounds;

(ii)     On July 22, 2022, an Insured named DD was purportedly involved in an automobile accident and thereafter begin treating at the Clinic located at 92-

08 Liberty Ave., Jamaica, New York. The Defendants then purported to provide the following Fraudulent Services to DD based upon fraudulent treatment protocols and without medical necessity: (i) on October 18, 2022, Star Chio purportedly performed five diagnostic ultrasounds; (ii) on January 10, 2023, Professional Chiro purportedly performed four diagnostic ultrasounds;

(iii)   On August 14, 2022, an Insured named ML was purportedly involved in an automobile accident and thereafter begin treating at the Clinic located at 550 Remsen Ave., Bronx, New York. The Defendants then purported to provide the following Fraudulent Services to ML based upon fraudulent treatment protocols and without medical necessity: (i) on September 26, 2022, Star Chio purportedly performed five diagnostic ultrasounds; (ii) on November 7, 2022, Star Chiro purportedly performed six diagnostic ultrasounds; and (iii) on January 27, 2023, Active Life Chiro purportedly performed five diagnostic ultrasounds;

(iv)   On August 14, 2022, an Insured named HS was purportedly involved in an automobile accident and thereafter begin treating at the Clinic located at 2273 65th St., Brooklyn, New York. The Defendants then purported to provide the following Fraudulent Services to HS based upon fraudulent treatment protocols and without medical necessity: (i) on August 31, 2022, Star Chio purportedly performed two diagnostic ultrasounds; (ii) on September 30, 2022, Star Chiro purportedly performed four diagnostic ultrasounds; and (iii) on February 17, 2023, Active Life Chiro purportedly performed four diagnostic ultrasounds;

(v)   On September 3, 2022, an Insured named DP was purportedly involved in an automobile accident and thereafter begin treating at the Clinic located at 488 Lafayette Ave., Brooklyn, New York. The Defendants then purported to provide the following Fraudulent Services to DP based upon fraudulent treatment protocols and without medical necessity: (i) on September 29, 2022, Star Chio purportedly performed five diagnostic ultrasounds; (ii) on November 3, 2022, Star Chiro purportedly performed six diagnostic ultrasounds; (iii) on December 1, 2022, Future Chiro purportedly performed five diagnostic ultrasounds; and (iv) on January 24, 2023, Active Life Chiro purportedly performed five diagnostic ultrasounds;

(vi)   On September 3, 2022, an Insured named BM was purportedly involved in an automobile accident and thereafter begin treating at the Clinic located at 550 Remsen Ave., Bronx, New York. The Defendants then purported to provide the following Fraudulent Services to BM based upon fraudulent treatment protocols and without medical necessity: (i) on September 12, 2022, Star Chio purportedly performed two diagnostic ultrasounds; (ii) on November 7, 2022, Star Chiro purportedly performed two diagnostic ultrasounds; and (iii) on

January 27, 2023, Active Life Chiro purportedly performed four diagnostic ultrasounds;

(vii)     On September 15, 2022, an Insured named DB was purportedly involved in an automobile accident and thereafter begin treating at the Clinic located at 488 Lafayette Ave., Brooklyn, New York.  The Defendants then purported to provide the following Fraudulent Services to DB based upon fraudulent treatment protocols and without medical necessity: (i) on October 27, 2022, Star Chio purportedly performed four diagnostic ultrasounds; (ii) on December 15, 2022, Future Chiro purportedly performed three diagnostic ultrasounds; and (iii) on January 12, 2013, Active Life Chiro purportedly performed four diagnostic ultrasounds;

(viii)    On September 16, 2022, an Insured named BC was purportedly involved in an automobile accident and thereafter begin treating at the Clinic located at 108-25 Merrick Blvd., Jamaica, New York.  The Defendants then purported to provide the following Fraudulent Services to BC based upon fraudulent treatment protocols and without medical necessity: (i) on September 26, 2022, Star Chio purportedly performed three diagnostic ultrasounds; (ii) on October 31, 2022, Star Chiro purportedly performed three diagnostic ultrasounds; and (iii) on December 19, 2022, Professional Chiro purportedly performed three diagnostic ultrasounds;

(ix)     On September 21, 2022, an Insured named AB was purportedly involved in an automobile accident and thereafter begin treating at the Clinic located at 2354 Westchester Ave., Bronx, New York.  The Defendants then purported to provide the following Fraudulent Services to AB based upon fraudulent treatment protocols and without medical necessity: (i) on October 12, 2022, Star Chio purportedly performed six diagnostic ultrasounds; and (ii) on December 12, 2022, Future Chiro purportedly performed six diagnostic ultrasounds;

(x)      On September 24, 2022, an Insured named GB was purportedly involved in an automobile accident and thereafter begin treating at the Clinic located at 37 Smith St., Freeport, New York.  The Defendants then purported to provide the following Fraudulent Services to GB based upon fraudulent treatment protocols and without medical necessity: (i) on October 11, 2022, Star Chio purportedly performed six diagnostic ultrasounds; (ii) on November 29, 2022, Star Chiro purportedly performed six diagnostic ultrasounds; and (iii) on January 17, 2023, Professional Chiro purportedly performed five diagnostic ultrasounds;

(xi)     On October 2, 2022, an Insured named MC was purportedly involved in an automobile accident and thereafter begin treating at the Clinic located at 2273 65th St., Brooklyn, New York.  The Defendants then purported to provide the following Fraudulent Services to MC based upon fraudulent treatment

protocols and without medical necessity: (i) on October 13, 2022, Star Chio purportedly performed five diagnostic ultrasounds; (ii) on November 30, 2022, Star Chiro purportedly performed five diagnostic ultrasounds; and (iii) on January 23, 2023, Active Life Chiro purportedly performed five diagnostic ultrasounds;

(xii) On October 4, 2022, an Insured named KC was purportedly involved in an automobile accident and thereafter begin treating at the Clinic located at 1975 Linden Blvd, Elmont, New York.  The Defendants then purported to provide the following Fraudulent Services to KC based upon fraudulent treatment protocols and without medical necessity: (i) on November 17, 2022, Star Chio purportedly performed five diagnostic ultrasounds; and (ii) on January 10, 2023, Professional Chiro purportedly performed five diagnostic ultrasounds;

(xiii) On October 6, 2022, an Insured named JR was purportedly involved in an automobile accident and thereafter begin treating at the Clinic located at 92-05 Rockaway Blvd., Ozone Park, New York.  The Defendants then purported to provide the following Fraudulent Services to J based upon fraudulent treatment protocols and without medical necessity: (i) on November 23, 2022, Star Chiro purportedly performed five diagnostic ultrasounds; (ii) on December 21, 2022, Professional Chiro purportedly performed four diagnostic ultrasounds; and (iii) on January 30, 2023, Professional Chiro purportedly performed five diagnostic ultrasounds;

(xiv) On November 14, 2022, an Insured named WF was purportedly involved in an automobile accident and thereafter begin treating at the Clinic located at 146 Empire Blvd., Brooklyn, New York.  The Defendants then purported to provide the following Fraudulent Services to WF based upon fraudulent treatment protocols and without medical necessity: (i) on November 21, 2022, Star Chio purportedly performed four diagnostic ultrasounds; (ii) on March 14, 2023, Active Life Chiro purportedly performed five diagnostic ultrasounds; and (iii) on April 13, 2023, Active Life Chiro purportedly performed five diagnostic ultrasounds;

(xv) On January 3, 2023, an Insured named RT was purportedly involved in an automobile accident and thereafter begin treating at the Clinic located at 560 Prospect Ave., Bronx, New York.  The Defendants then purported to provide the following Fraudulent Services to RT based upon fraudulent treatment protocols and without medical necessity: (i) on February 7, 2023, Future Chio purportedly performed four diagnostic ultrasounds; (ii) on March 22, 2023, Active Life Chiro purportedly performed three diagnostic ultrasounds; and (iii) on April 18, 2023, Active Life Chiro purportedly performed three diagnostic ultrasounds.

123.     These are only representative examples.  The serial ultrasound approach that the Defendants purported to provide to Insureds was not based on medical necessity. Instead, it was designed solely to maximize the charges that the Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

    c.   <u>Medically Unnecessary Diagnostic Ultrasounds Performed After Insureds Received MRIs</u>

124.     As part of their pre-determined fraudulent treatment and billing protocol and illegal kickback and referral arrangements, the Defendants also purported to provide the medically unnecessary diagnostic ultrasounds to Insureds even *after* the Insureds had already received an MRI to the same body part.

125.     An ultrasound produces imagines of the soft tissues in a person's musculoskeletal system, which can show issues with muscles, tendons, ligaments, and other connective tissue. An MRI can detect inflammation, tumors, congenital abnormalities, herniations, or degeneration and is considered a better diagnostic tool when viewing larger areas of soft tissue, joints, bones, muscles, or cartilage.

126.     The Defendants purported to subject many Insureds to diagnostic ultrasounds, supposedly to evaluate how the Insureds were responding to treatment following what was virtually always a minor automobile accident.

127.     However, these diagnostic ultrasounds were unnecessary because there is no legitimate medical evidence that diagnostic ultrasounds are useful in evaluating a person's response to treatment.

128.     Further, in many cases, the diagnostic ultrasounds were also medically unnecessary because the Insureds who purportedly were subjected to them had already received MRIs, which

is a superior imaging tool to ascertain the effectiveness of treatment compared to ultrasounds, as MRIs provide higher quality imaging of larger areas of soft tissue and other structures.

129.    When a patient receives a musculoskeletal diagnostic ultrasound following an MRI, the diagnostic ultrasound imaging provides no new information to the treating healthcare provider. This is especially true when an MRI and ultrasound are done close in time.

130.    No legitimate healthcare practitioner would refer a patient simultaneously for an MRI and diagnostic ultrasound, or for a diagnostic ultrasound close in proximity to referring a patient for an MRI.

131.    However, in order to further profit from their fraudulent scheme, the Defendants routinely received referrals for diagnostic ultrasounds from healthcare practitioners at the Clinics for the performance of diagnostic ultrasounds to Insureds either on the same date the referring healthcare provider simultaneously referred the Insured for an MRI, or as a secondary form of diagnostic imaging after the Insureds had already received an MRI. This, despite the fact that the Insureds had not suffered injuries that would warrant diagnostic ultrasounds, and – in any case – had no change in their treatment based on the findings of the MRIs and/or ultrasounds.

132.    For example:

(i)     On July 11, 2022, an Insured named Victor Gonzalez VG was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 1100 Pelham Pkwy., Bronx, New York.  On August 11, 2022, VG received MRIs to their right shoulder and cervical spine.  On August 15, 2022, just four days after VG's last MRI, Star Chiro purportedly performed diagnostic ultrasounds, also on VG's right shoulder and cervical spine.

(ii)    On April 20, 2022, two Insureds named William Everett WE and Jaime Garcia JG were both purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 560 Prospect Ave., Bronx, New York.  Between May 4 and June 27, 2022, WE and JG both received MRIs to their left and right shoulder and cervical and lumbar spine.  On July 28, 2022, Star Chiro purportedly performed diagnostic ultrasounds, also on WE and JG's cervical and lumbar spine.

(iii)    On September 4, 2022, an Insured named DiMaris Delgado DD was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 34-07 White Plains Rd., Bronx, New York.  Between December 8 and December 13, 2022, DD received MRIs to their left shoulder and cervical and lumbar spine.  On February 2, 2023, Future Chiro purportedly performed diagnostic ultrasounds, also on DD's left shoulder and cervical and lumbar spine.

(iv)    On September 8, 2022, an Insured named Dwayne Hope DH was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 1975 Linden Blvd., Elmont, New York.  On December 8, 2022, DH received MRIs to their lumbar and cervical spine.   On January 24, 2023, Professional Chiro purportedly performed diagnostic ultrasounds, also on DH's lumbar and cervical spine.

(v)    On September 17, 2022, an Insured named Abubakar Hazma AH was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 4014A Boston Rd., Bronx, New York.  Between October 29 and November 5, 2022, AH received MRIs to their left shoulder, left knee, and cervical, lumbar, and thoracic spine.  On November 16, 2022, only 11 days after AH's last MRI, Star Chiro purportedly performed diagnostic ultrasounds, also on AH's left shoulder, left knee, and cervical, lumbar, and thoracic spine.

(vi)    On October 8, 2022, an Insured named Brian Ramos BR was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 2354 Westchester Ave., Bronx, New York.  On December 8, 2022, BR received an MRI to their left shoulder.  On December 12, 2022, just four days after BR's last MRI, Future Chiro purportedly performed diagnostic ultrasounds, also on BR's left shoulder.

(vii)    On October 28, 2022, an Insured named Peter Smith PS was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 92-05 Rockaway Blvd., Ozone Park, New York.  Between December 5, 2022 and January 5, 2023, PS received MRIs to their left and right knee, right shoulder, and lumbar, cervical, and thoracic spine.  On February 13, 2023, Professional Chiro purportedly performed diagnostic ultrasounds, also on PS's lumbar, cervical, and thoracic spine.

(viii)    On October 29, 2022, an Insured named Ashlee Merrill AM was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 488 Lafayette Ave., Brooklyn, New York.  Between November 22 and December 1, 2022, AM received MRIs to their right shoulder and cervical, lumbar, and thoracic spine.  On December 1, 2022, the same day as AM's last MRI, Future Chiro purportedly performed diagnostic ultrasounds, also on AM's right shoulder and cervical, lumbar, and thoracic spine.

(ix)     On November 30, 2022, an Insured named Saccheena Hucey SH was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 3407 White Plains Rd., Bronx, New York.  On December 15, 2022, SH received MRIs to their left shoulder and cervical and lumbar spine.  On January 12, 2023, Future Chiro purportedly performed diagnostic ultrasounds, also on SH's left shoulder and cervical and lumbar spine.

(x)      On December 3, 2022, an Insured named Mildred Lopez ML was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 1320 Louis Nine Blvd., Bronx, New York.  Between January 19 and January 26, 2023, ML received MRIs to their right and left knee, and cervical and lumbar spine.  On February 17, 2023, Active Life Chiro purportedly performed diagnostic ultrasounds, also on ML's right and left knee and cervical and lumbar spine.

(xi)     On December 12, 2022, an Insured named Mohammad Rahman MR was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 160-59 Rockaway Blvd., Jamaica, New York.  Between December 22, 2022 and January 15, 2023, MR received MRIs to their left shoulder, left elbow, and lumbar spine.  On January 26, 2023, just 11 days after MR's last MRI, Professional Chiro purportedly performed diagnostic ultrasounds, also on MR's left shoulder, left elbow, and lumbar spine.

(xii)    On March 30, 2023, an Insured named Victorine Batt VB was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 1251 Ralph Ave., Brooklyn, New York.  On June 3, 2023, VB received MRIs to their lumbar and thoracic spine.  On June 8, 2023, only five days later, Active Life Chiro purportedly performed diagnostic ultrasounds, also on VB's lumbar and thoracic spine.

(xiii)   On April 21, 2023, an Insured named Nyree Raymond NR was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 3055 3rd Ave., Bronx, New York.  Between June 10 and June 17, 2023, NR received MRIs to their right knee and cervical and lumbar spine.  On June 29, 2023, just 12 days after NR's last MRI, Active Life Chiro purportedly performed diagnostic ultrasounds, also on NR's right knee and cervical and lumbar spine.

(xiv)    On May 12, 2023, an Insured named Kelvin Maxwell KM was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 488 Lafayette Ave., Brooklyn, New York.  Between July 3 and July 11, 2023, KM received MRIs to their left knee and cervical and lumbar spine.  On July 31, 2023, just 20 days after KM's last MRI, Active Life Chiro purportedly performed diagnostic ultrasounds, also on NR's left knee and cervical and lumbar spine.

(xv)     On June 15, 2023, an Insured named Arianna Mora AM was purportedly involved in an automobile accident and thereafter began treating at the Clinic located at 180-09 Jamaica Ave., Jamaica, New York.  Between June 29 and July 10, 2023, AM received MRIs to their right and left shoulder, left knee, and cervical, lumbar, and thoracic spine.  On July 1, 2023, just one day after AM's last MRI, Active Life Chiro purportedly performed diagnostic ultrasounds, also on AM's right and left shoulder and cervical, lumbar, and thoracic spine.

133.    These are representative examples. The Defendants' charges for diagnostic ultrasounds were fraudulent, medically unnecessary and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent treatment protocols and illegal kickback and referral arrangements between the Defendants and others, not pursuant to the documented and clinically reasonable needs of the Insured.

## IV.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

134.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and treatment reports through the Provider Defendants to GEICO seeking payment for the Fraudulent Services for which Defendants were not entitled to receive payment.

135.    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst Defendants and others.

(iii)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

## V.     Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

136.     The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

137.     To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

138.     Specifically, the Defendants knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

139.     Additionally, the Defendants entered into complex financial arrangements that were designed to, and did, conceal the fact that Defendants unlawfully exchanged kickbacks for patient referrals.

140.     Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

141.     What is more, Defendants billed for the Fraudulent Services through separate entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby

preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

142.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner.

143.    Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

144.    GEICO is under statutory and contractual obligations to promptly and fairly process claims.  The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $360,000.00 based upon the fraudulent charges.

145.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
**Against Vavikova, Star Chiro, Active Life Chiro, Professional Chiro, and Future Chiro**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

146.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

147.    There is an actual case and controversy between GEICO Vavikova, Star Chiro, Active Life Chiro, Professional Chiro, and Future Chiro regarding more than $2.4 million in

fraudulent billing for the Fraudulent Services that have been submitted to GEICO through the Provider Defendants.

148.     Vavikova, Star Chiro, Active Life Chiro, Professional Chiro, and Future Chiro have no right to receive payment for any pending bills submitted to GEICO under the name of the Provider Defendants because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds.

149.     Vavikova, Star Chiro, Active Life Chiro, Professional Chiro, and Future Chiro have no right to receive payment for any pending bills submitted to GEICO under the name of the Provider Defendants because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst Defendants and others.

150.     Vavikova, Star Chiro, Active Life Chiro, Professional Chiro, and Future Chiro have no right to receive payment for any pending bills submitted to GEICO under the name of the Provider Defendants because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

151.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Vavikova, Star Chiro, Active Life Chiro, Professional Chiro, and Future Chiro have no right to receive payment for any pending bills submitted to GEICO under the names of Star Chiro, Active Life Chiro, Professional Chiro, and Future Chiro.

## AS AND FOR A SECOND CAUSE OF ACTION
### Against Vavikova

**(Violation of RICO, 18 U.S.C. § 1962(c))**

152.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

153.    Star Chiro, Active Life Chiro, Professional Chiro, and Future Chiro together constitute an association-in-fact "enterprise" (the "Vavikova Fraud Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

154.    The members of the Vavikova Fraud Enterprise are and have been associated through time, joined in purposed and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Star Chiro, Active Life Chiro, Professional Chiro, and Future Chiro are independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

155.    The Vavikova Fraud Enterprise operated under four separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Vavikova Fraud Enterprise acting singly or without the aid of each other.

156.    The Vavikova Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail

fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

157.   Vavikova has been employed by and/or associated with the Vavikova Fraud Enterprise.

158.   Vavikova knowingly has conducted and/or participated, directly or indirectly, in the conduct of the Vavikova Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the Vavikova Fraud Enterprise was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (ii) the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; and (iii) the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering

activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1" through "4".

159.     The Vavikova Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Vavikova operates the Vavikova Fraud Enterprise, inasmuch as the Vavikova Fraud Enterprise never operated legitimate medical practices, never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through each of the Provider Defendants to the present day.

160.     The Vavikova Fraud Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the Vavikova Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $360,000.00 pursuant to the fraudulent bills submitted by Vavikova through the Vavikova Fraud Enterprise.

161.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Against Vavikova and John Doe Defendants "1" – "10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

162.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

163.    The Vavikova Fraud Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

164.    Vavikova and the John Doe Defendants are employed by and/or associated with the Vavikova Fraud Enterprise.

165.    Vavikova and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Vavikova Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that Star Chiro, Active Life Chiro, Professional Chiro, and Future Chiro were not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (ii) the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; and (iii) the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1" through "4".

166.    Vavikova and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

167.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $360,000.00 pursuant to the fraudulent bills submitted by Defendants through Star Chiro, Active Life Chiro, Professional Chiro, and Future Chiro.

168.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A FOURTH CAUSE OF ACTION
**Against Vavikova**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

169.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

170.    Star Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

171.    Vavikova knowingly conducted and/or participated, directly or indirectly, in the conduct of Star Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges since June 2022 seeking payments that Star Chiro was not eligible to receive under the New York no-fault insurance laws because: (i) the Fraudulent Services were not medically necessary; (ii) the Fraudulent Services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were

provided in order to inflate the charges that could be submitted;  and (iv) Star Chiro obtained its patients through the Defendants' illegal kickback scheme. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

172.    Star Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Vavikova operated Star Chiro, insofar as Star Chiro is not engaged in a legitimate medical practice, and therefore, acts of mail fraud are essential in order for Star Chiro to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Star Chiro to the present day.

173.    Star Chiro is engaged in inherently unlawful acts, inasmuch as it continues attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Star Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

174.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $265,000.00 pursuant to the fraudulent bills submitted through Star Chiro.

175.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Against Vavikova and John Doe Defendants "1" – "10"
### (Violation of RICO, 18 U.S.C. § 1962(d))

176.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

177.    Star Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

178.    Vavikova and John Doe Defendants "1" – "10" are employed by or associated with the Star Chiro enterprise.

179.    Vavikova and John Doe Defendants "1" - "10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Star Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that Star Chiro was not eligible under the No-Fault laws because: (i) the Fraudulent Services were not medically necessary; (ii) the Fraudulent Services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) Star Chiro obtained its patients through Defendants' illegal kickback scheme. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

180.     Vavikova and the John Doe Defendants "1" – "10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

181.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $265,000.00 pursuant to the fraudulent bills submitted through Star Chiro.

182.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A SIXTH CAUSE OF ACTION
**Against Vavikova and Star Chiro**
**(Common Law Fraud)**

183.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

184.     Vavikova and Star Chiro intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services submitted under the name of Star Chiro.

185.     The false and fraudulent statements of material fact and acts of fraudulent concealment include (i) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Defendants were properly licensed and in compliance with all relevant laws

and regulations governing healthcare practice when, in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst Defendants and others; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule when, in fact, the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

186.    Vavikova and Star Chiro intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Star Chiro that were not compensable under the New York no-fault insurance laws. The fraudulent billings and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "1".

187.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $265,000.00 pursuant to the fraudulent bills submitted through Star Chiro.

188.    Vavikova and Star Chiro's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

189.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Against Vavikova and Star Chiro
### (Unjust Enrichment)

190.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

191.     As set forth above, Vavikova and Star Chiro have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

192.     When GEICO paid the bills and charges submitted by or on behalf of Star Chiro for No-Fault benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

193.     Vavikova and Star Chiro have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Vavikova and Star Chiro voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

194.     Vavikova and Star Chiro's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

195.     By reason of the above, Vavikova and Star Chiro have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $265,000.00.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
**Against John Doe Defendants "1"- "10"**
**(Aiding and Abetting Fraud)**

196.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

197.     John Doe Defendants "1" - "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Vavikova and Star Chiro.

198.     The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Star Chiro in exchange for illegal kickbacks from Vavikova and Star Chiro and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

199.    The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Vavikova and Star Chiro to obtain payment from GEICO and other insurers.

200.    John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Vavikova and Star Chiro for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

201.    The conduct of John Doe Defendants "1" – "10" caused GEICO to pay more than $265,000.00 pursuant to the fraudulent bills submitted through Star Chiro.

202.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

203.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A NINTH CAUSE OF ACTION
**Against Vavikova**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

204.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

205.    Active Life Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

206. Vavikova knowingly conducted and/or participated, directly or indirectly, in the conduct of Active Life Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges since December 2022 seeking payments that Active Life Chiro was not eligible to receive under the New York no-fault insurance laws because: (i) the Fraudulent Services were not medically necessary; (ii) the Fraudulent Services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) Active Life Chiro obtained its patients through the Defendants' illegal kickback scheme. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

207. Active Life Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Vavikova operated Active Life Chiro, insofar as Active Life Chiro is not engaged in a legitimate medical practice, and therefore, acts of mail fraud are essential in order for Active Life Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Active Life Chiro to the present day.

208.     Active Life Chiro is engaged in inherently unlawful acts, inasmuch as it continues attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Active Life Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

209.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $61,000.00 pursuant to the fraudulent bills submitted through Active Life Chiro.

210.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A TENTH CAUSE OF ACTION
**Against Vavikova and John Doe Defendants "1" – "10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

211.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

212.     Active Life Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

213.     Vavikova and John Doe Defendants "1" – "10" are employed by or associated with the Active Life Chiro enterprise.

214.     Vavikova and John Doe Defendants "1" - "10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Active Life Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that Active Life Chiro was not eligible

under the No-Fault laws because: (i) the Fraudulent Services were not medically necessary; (ii) the Fraudulent Services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) Active Life Chiro obtained its patients through Defendants' illegal kickback scheme. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

215.    Vavikova and the John Doe Defendants "1" – "10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

216.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $61,000.00 pursuant to the fraudulent bills submitted through Active Life Chiro.

217.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### Against Vavikova and Active Life Chiro
### (Common Law Fraud)

218.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

219.    Vavikova and Active Life Chiro intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the

course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services submitted under the name of Active Life Chiro.

220.    The false and fraudulent statements of material fact and acts of fraudulent concealment include (i) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Defendants were properly licensed and in compliance with all relevant laws and regulations governing healthcare practice when, in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst Defendants and others; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule when, in fact, the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

221.    Vavikova and Active Life Chiro intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Active Life Chiro that were not compensable under the New York no-fault insurance laws. The fraudulent billings and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "2".

222.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $61,000.00 pursuant to the fraudulent bills submitted through Active Life Chiro.

223.     Vavikova and Active Life Chiro's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

224.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWELFTH CAUSE OF ACTION
**Against Vavikova and Active Life Chiro**
**(Unjust Enrichment)**

225.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

226.     As set forth above, Vavikova and Active Life Chiro have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

227.     When GEICO paid the bills and charges submitted by or on behalf of Active Life Chiro for No-Fault benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

228.     Vavikova and Active Life Chiro have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Vavikova and Active Life Chiro voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

229.     Vavikova and Active Life Chiro's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

230.     By reason of the above, Vavikova and Active Life Chiro have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $61,000.00.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### Against John Doe Defendants "1"- "10"
### (Aiding and Abetting Fraud)

231.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

232.    John Doe Defendants "1" - "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Vavikova and Active Life Chiro.

233.    The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Active Life Chiro in exchange for illegal kickbacks from Vavikova and Active Life Chiro and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

234.    The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Vavikova and Active Life Chiro to obtain payment from GEICO and other insurers.

235.    John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Vavikova and Active Life Chiro for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

236.    The conduct of John Doe Defendants "1" – "10" caused GEICO to pay more than $61,000.00 pursuant to the fraudulent bills submitted through Active Life Chiro.

237.     This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

238.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A FOURTEENTH CAUSE OF ACTION**
**Against Vavikova**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

239.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

240.     Professional Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

241.     Vavikova knowingly conducted and/or participated, directly or indirectly, in the conduct of Professional Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges since December 2022 seeking payments that Professional Chiro was not eligible to receive under the New York no-fault insurance laws because: (i) the Fraudulent Services were not medically necessary; (ii) the Fraudulent Services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) Professional Chiro obtained its patients through the Defendants' illegal kickback scheme. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that

comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

242.   Professional Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Vavikova operated Professional Chiro, insofar as Professional Chiro is not engaged in a legitimate medical practice, and therefore, acts of mail fraud are essential in order for Professional Chiro to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Professional Chiro to the present day.

243.   Professional Chiro is engaged in inherently unlawful acts, inasmuch as it continues attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Professional Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

244.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $19,000.00 pursuant to the fraudulent bills submitted through Professional Chiro.

245.   By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A FIFTEENTH CAUSE OF ACTION**
**Against Vavikova and John Doe Defendants "1" – "10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

246.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

247.    Professional Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

248.    Vavikova and John Doe Defendants "1" – "10" are employed by or associated with the Professional Chiro enterprise.

249.    Vavikova and John Doe Defendants "1" - "10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Professional Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that Professional Chiro was not eligible under the No-Fault laws because: (i) the Fraudulent Services were not medically necessary; (ii) the Fraudulent Services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) Professional Chiro obtained its patients through Defendants' illegal kickback scheme. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

250.    Vavikova and the John Doe Defendants "1" – "10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

251. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $19,000.00 pursuant to the fraudulent bills submitted through Professional Chiro.

252. By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
**Against Vavikova and Professional Chiro**
**(Common Law Fraud)**

253. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

254. Vavikova and Professional Chiro intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services submitted under the name of Professional Chiro.

255. The false and fraudulent statements of material fact and acts of fraudulent concealment include (i) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Defendants were properly licensed and in compliance with all relevant laws and regulations governing healthcare practice when, in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst Defendants and others; and (iii) in every claim, the representation that the billed-for services were

medically necessary and properly billed in accordance with the Fee Schedule when, in fact, the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

256.    Vavikova and Professional Chiro intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Professional Chiro that were not compensable under the New York no-fault insurance laws. The fraudulent billings and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "3".

257.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $19,000.00 pursuant to the fraudulent bills submitted through Professional Chiro.

258.    Vavikova and Professional Chiro's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

259.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

### AS AND FOR A SEVENTEENTH CAUSE OF ACTION
**Against Vavikova and Professional Chiro**
**(Unjust Enrichment)**

260.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

261.    As set forth above, Vavikova and Professional Chiro have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

262.     When GEICO paid the bills and charges submitted by or on behalf of Professional Chiro for No-Fault benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

263.     Vavikova and Professional Chiro have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Vavikova and Professional Chiro voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

264.     Vavikova and Professional Chiro's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

265.     By reason of the above, Vavikova and Professional Chiro have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $19,000.00.

**AS AND FOR AN EIGHTEENTH CAUSE OF ACTION**
**Against John Doe Defendants "1"- "10"**
**(Aiding and Abetting Fraud)**

266.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

267.     John Doe Defendants "1" - "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Vavikova and Professional Chiro.

268.     The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Professional Chiro in exchange for illegal kickbacks from Vavikova and Professional Chiro and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

269.    The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Vavikova and Professional Chiro to obtain payment from GEICO and other insurers.

270.    John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Vavikova and Professional Chiro for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

271.    The conduct of John Doe Defendants "1" – "10" caused GEICO to pay more than $19,000.00 pursuant to the fraudulent bills submitted through Professional Chiro.

272.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

273.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A NINETEENTH CAUSE OF ACTION
**Against Vavikova**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

274.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

275.    Future Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

276.    Vavikova knowingly conducted and/or participated, directly or indirectly, in the conduct of Future Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges since December 2022 seeking payments that Future Chiro was not eligible to receive under the New York no-fault insurance laws because: (i) the Fraudulent Services were not medically necessary; (ii) the Fraudulent Services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted;  and (iv) Future Chiro obtained its patients through the Defendants' illegal kickback scheme. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

277.    Future Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Vavikova operated Future Chiro, insofar as Future Chiro is not engaged in a legitimate medical practice, and therefore, acts of mail fraud are essential in order for Future Chiro to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Future Chiro to the present day.

278.    Future Chiro is engaged in inherently unlawful acts, inasmuch as it continues attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Future Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

279.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $15,000.00 pursuant to the fraudulent bills submitted through Future Chiro.

280.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A TWENTIETH CAUSE OF ACTION
**Against Vavikova and John Doe Defendants "1" – "10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

281.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

282.    Future Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

283.    Vavikova and John Doe Defendants "1" – "10" are employed by or associated with the Future Chiro enterprise.

284.    Vavikova and John Doe Defendants "1" - "10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Future Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that Future Chiro was not eligible under the No-

Fault laws because: (i) the Fraudulent Services were not medically necessary; (ii) the Fraudulent Services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) Future Chiro obtained its patients through Defendants' illegal kickback scheme. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "4".

285.    Vavikova and the John Doe Defendants "1" – "10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

286.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $15,000.00 pursuant to the fraudulent bills submitted through Future Chiro.

287.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
**Against Vavikova and Future Chiro**
**(Common Law Fraud)**

288.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

289.    Vavikova and Future Chiro intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of

their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services submitted under the name of Future Chiro.

290.   The false and fraudulent statements of material fact and acts of fraudulent concealment include (i) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Defendants were properly licensed and in compliance with all relevant laws and regulations governing healthcare practice when, in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst Defendants and others; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule when, in fact, the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

291.   Vavikova and Future Chiro intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Active Life Chiro that were not compensable under the New York no-fault insurance laws. The fraudulent billings and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "4".

292.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $15,000.00 pursuant to the fraudulent bills submitted through Future Chiro.

293.    Vavikova and Future Chiro's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

294.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TWENTY-SECOND CAUSE OF ACTION
### Against Vavikova and Future Chiro
### (Unjust Enrichment)

295.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

296.    As set forth above, Vavikova and Future Chiro have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

297.    When GEICO paid the bills and charges submitted by or on behalf of Future Chiro for No-Fault benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

298.    Vavikova and Future Chiro have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Vavikova and Future Chiro voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

299.    Vavikova and Future Chiro's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

300.    By reason of the above, Vavikova and Future Chiro have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $15,000.00.

## AS AND FOR A TWENTY-THIRD CAUSE OF ACTION
### Against John Doe Defendants "1"- "10"
### (Aiding and Abetting Fraud)

301.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

302.    John Doe Defendants "1" - "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Vavikova and Future Chiro.

303.    The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Future Chiro in exchange for illegal kickbacks from Vavikova and Future Chiro and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

304.    The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Vavikova and Future Chiro to obtain payment from GEICO and other insurers.

305.    John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Vavikova and Future Chiro for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

306.    The conduct of John Doe Defendants "1" – "10" caused GEICO to pay more than $19,000.00 pursuant to the fraudulent bills submitted through Future Chiro.

307.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

308.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

309.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a judgment be entered in their favor:

A.     On the First Cause of Action against the Provider Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Vavikova, Star Chiro, Professional Chiro, Active Life Chiro, and Future Chiro have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Vavikova, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $360,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Vavikova and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $360,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

D.     On the Fourth Cause of Action against Vavikova, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $265,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E. On the Fifth Cause of Action against Vavikova and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $265,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F. On the Sixth Cause of Action against Vavikova and Star Chiro, more than $265,000.00 in compensatory damages, plus costs, interest, and such other and further relief as this Court deems just and proper;

G. On the Seventh Cause of Action against Vavikova and Star Chiro, more than $265,000.00 in compensatory damages, plus costs, interest, and such other and further relief as this Court deems just and proper;

H. On the Eighth Cause of Action against John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $265,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

I. On the Ninth Cause of Action against Vavikova, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $61,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J. On the Tenth Cause of Action against Vavikova and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $61,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Vavikova and Active Life Chiro, more than $61,000.00 in compensatory damages, plus costs, interest, and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against Vavikova and Active Life Chiro, more than $61,000.00 in compensatory damages, plus costs, interest, and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $61,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Vavikova, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $19,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.      On the Fifteenth Cause of Action against Vavikova and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $19,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.      On the Sixteenth Cause of Action against Vavikova and Professional Chiro, more than $19,000.00 in compensatory damages, plus costs, interest, and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Vavikova and Professional Chiro, more than $19,000.00 in compensatory damages, plus costs, interest, and such other and further relief as this Court deems just and proper;

R. On the Eighteenth Cause of Action against John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $19,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

S. On the Nineteenth Cause of Action against Vavikova, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $15,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

T. On the Twentieth Cause of Action against Vavikova and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $15,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

U. On the Twenty-First Cause of Action against Vavikova and Future Chiro, more than $15,000.00 in compensatory damages, plus costs, interest, and such other and further relief as this Court deems just and proper;

V. On the Twenty-Second Cause of Action against Vavikova and Future Chiro, more than $15,000.00 in compensatory damages, plus costs, interest, and such other and further relief as this Court deems just and proper; and

W. On the Twenty-Third Cause of Action against John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $15,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated: December 8, 2023
       Uniondale, New York

RIVKIN RADLER LLP

By: _/s/ Barry I. Levy_____
      Barry I. Levy, Esq.
      Priscilla Kam, Esq.
      Philip P. Nash, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

4861-3021-6539, v. 3